**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

IN RE:

**FOREST HILL FUNERAL HOME & MEMORIAL PARK - EAST, LLC, a Tennessee, LLC, d/b/a FOREST HILL FUNERAL HOME AND MEMORIAL PARK - MIDTOWN, d/b/a FOREST HILL FUNERAL HOME AND MEMORIAL PARK - SOUTH, d/b/a EDGEWOOD MEMORIAL PARK, d/b/a ARLINGTON PARK CEMETERY, d/b/a MEMORIAL PARK, d/b/a REST HAVEN MEMORIAL GARDENS,**

**Debtor.**

**Filed / Docketed
March 26, 2007**

**Case No. 07-80056
Chapter 11**

## MEMORANDUM OPINION

This is truly an unusual case. The question before the Court is not what should happen to this debtor: all of the participants in the case agree that the debtor needs to be sold to a third party as quickly as possible. The question is whether the process should be supervised by a federal bankruptcy court or a Tennessee state court. If the Court determines that the debtor belongs in bankruptcy, the Court is also asked to decide whether the case should remain in Oklahoma or be sent to Tennessee. An evidentiary hearing on these matters was held on March 12, 2007. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to these contested matters by Federal Rule of Bankruptcy Procedure 9014.

### Jurisdiction

This Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(b), and

venue is proper pursuant to 28 U.S.C. § 1408.[1]  Reference to the Court of the case is proper pursuant to 28 U.S.C. § 157(a).  The contested matters presently before the Court are core proceedings as contemplated by 28 U.S.C. § 157(b)(2)(A).

## Findings of Fact

Forest Hill Funeral Home & Memorial Park, LLC ("Forest Hill" or "Debtor") is a limited liability company formed in Tennessee, consisting of three separate cemeteries, three funeral homes, and three mausoleums located in Memphis, Tennessee.  Debtor also owns and operates four cemeteries in Arkansas.  None of Forest Hill's operating revenue is generated in the State of Oklahoma.

As part of its business model, Forest Hill sells preneed funeral and burial policies and preneed cemetery merchandise and services.  "Preneed" services are what their name implies:  a customer makes his or her funeral arrangements and pays for them, either in a lump sum or over time with the idea that, at the time of death, the services are fully paid for.  When a consumer purchases preneed services, Tennessee law requires that the funds be held in trust until the services are performed and the monies thereby earned by the funeral home.[2]  Approximately 13,500

---

[1]  Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

[2]  As explained by Kevin Harden, an auditor employed by the Tennessee Department of Commerce and Insurance:

> Generally stated, under Title 62, Chapter 5, Part 4 of the Tennessee Code Annotated, and Rules of the Department of Commerce and Insurance, a seller of preneed funeral contracts shall deposit all funds on account of a preneed contract as soon as possible after receipt, and in no event later than thirty (30) days after receipt.  All such money is to be deposited into a trust account, and the trust company must be able to ascertain at all times the amount due the beneficiary or beneficiaries of the funds.  All payments under the preneed funeral contract are to remain with the trustee until the death of the person for whose service the funds are paid.  In order to properly

2

individuals in the Memphis, Tennessee area have purchased preneed funeral contracts from Forest Hill that remain unperformed.

The business of cemetery and funeral home operation is highly regulated in Tennessee. The agency responsible for regulating funeral homes in Tennessee is the Tennessee Department of Commerce and Insurance (the "TDCI"). Various aspects of the funeral home, cemetery, and mausoleum business are regularly reviewed and monitored, including but not limited to the management of the funds (including funds from preneed services contracts) required to be held in trust by the funeral home. There are two primary ways that a funeral home trustee invests preneed services funds to ensure that funds are available to pay for funeral services at the time of death: either the money is invested "prudently,"[3] or a life insurance policy is purchased on the life of the preneed client.

In addition to preneed burial funds, funeral homes in Tennessee are also required to set aside

---

withdraw from the preneed funeral trust, a funeral home operator must supply the trustee with a certified copy of the death certificate together with a verified statement setting forth that all terms and conditions of the preneed funeral contract have been fully performed. The trustee shall pay any balance remaining in the fund after payment for the merchandise and services to the purchaser or the purchaser's estate.

*TDCI Ex. 2* at 5 – 6.

[3] Investments of funds held in trust for preneed funeral services in Tennessee are governed by the "prudent investment rule," which requires that

A financial institution acting as trustee of trust funds under these rules shall invest such funds in accordance with applicable law. In so investing, such trustee shall exercise the judgment and care under the circumstances prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to the speculation, but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital.

Tenn. Comp. R. & Regs. 0780-5-10-.09, cited in *TDCI Ex. 1* at 30.

Case 07-80056    Doc 207    Filed 03/26/07    Entered 03/26/07 11:51:03    Desc Main
Document    Page 3 of 27

certain additional funds in trust for the purpose of maintaining cemetery grounds and mausoleums. Such funds are also subject to the "prudent investment rule." Prior to December 3, 2004, the owner of Forest Hill had established 12 separate trusts as required by Tennessee law to satisfy its obligations under the preneed funeral and burial policies, the preneed cemetery merchandise and services agreements, and to provide for the perpetual care, improvement, and maintenance of the cemeteries (hereafter referred to as the "Trust Accounts").

On or about December 3, 2004, Indian Nation, LLC ("Indian Nation") purchased Forest Hill. Indian Nation is a Nevada limited liability company with its principal offices in Oklahoma. Clayton R. Smart ("Smart") is the principal owner of Indian Nation, owning 95% of the company. Stephen W. Smith ("Smith"), an attorney who resides in Okmulgee, Oklahoma, owns the remaining 5% of Indian Nation. At some point prior to January 22, 2007, ownership of Forest Hill was transferred from Indian Nation to Smart (95%) and Smith (5%) individually.

When Indian Nation purchased Forest Hill, the Trust Accounts held assets worth approximately $29.5 million, including cash, investments, and cash value of life insurance policies. The trustee for the Trust Accounts at the time of purchase was Forethought Federal Savings Bank, Batesville, Indiana ("Forethought"). The trust assets included life insurance policies with a face value of approximately $22 million. The cash surrender value of these policies was significantly less than their face amount. In early 2005, Smart met with representatives of the TDCI and inquired as to whether investments in oil and gas leases and/or hedge funds would be considered prudent investments of funeral trust funds under Tennessee law. Smart was unequivocally told such investments would not be acceptable "because investments of those types were too speculative, high risk, and not consistent with the prudent man rule which governs the investment of [funeral home]

4

trust assets."[4]

In October 2005, the TDCI began a routine audit of Forest Hill's trust assets. The examination was conducted under the supervision of Kevin Harden, an auditor and certified public accountant employed by TDCI. This examination revealed that the value of Forest Hill's trust assets had declined to approximately $20 million. In late October 2005, Harden met personally with Smart to discuss the examination's findings. Smart told Harden that Forest Hill had transferred the Trust Accounts from Forethought to Community Trust & Investment Company of Noblesville, Indiana ("Community Trust"). Smart further indicated that Community Trust directed Forethought to cash in the $22 million in life insurance policies that had constituted a portion of the trust assets. The cash value of the life insurance policies was $12,255,082.13, or almost $10 million less than their face value.

Harden later contacted Community Trust to learn the status of the trust assets. He discovered that approximately $10.7 million from the Trust Accounts had been used to purchase a debenture issued by Quest Mineral & Exploration, Inc. ("Quest"). He also learned that approximately $6.7 million in trust funds had been used to purchase shares in the Topiary Fund, a hedge fund managed by Citigroup/Smith Barney. In March 2006, Harden and Robert Gribble, Executive Director of the Burial Services Division of the TDCI, met with Smart to discuss the investment of Trust Account funds. The Quest debenture was a main topic of conversation at this meeting. Smart denied that he had any ownership in Quest and indicated that Quest was owned by Erma Huckstep. Smart also maintained that the investment of funds in Quest would generate a better return than could be obtained from any other investment.

---

[4] *TDCI Ex. 1* at 3.

Case 07-80056    Doc 207    Filed 03/26/07    Entered 03/26/07 11:51:03    Desc Main
Document    Page 5 of 27

The report of Trey King, an investigator employed by the Office of the Attorney General & Reporter of the State of Tennessee, regarding the Quest investment is most telling:

2.      In February 2006, the Tennessee Attorney General opened an investigation of Clayton Smart, Forest Hill Funeral Home and Memorial Park, LLC (Forest Hill), Quest Minerals & Exploration, Inc. (Quest), and persons and other entities associated with them. Part of the investigation has covered Quest, a company that received approximately $10,700,000 in cash from the Forest Hill trusts in exchange for a debenture that was issued by Quest.

3.      This investigation has become a joint effort among agencies in the States of Oklahoma, Michigan, and Tennessee. Regulators and investigators in all three jurisdictions have been working together, and sharing the evidence they have obtained.

4.      I was present at a meeting that Clayton Smart had with employees of the Burial Services Section of the Tennessee Department of Commerce and Insurance in March 2006. *During that meeting, Smart stated that he was not an officer or owner of Quest, and that he had never been an officer or owner of that company. Smart further stated that he was not related to the owners or officers of Quest.* According to Smart, his only tie to Quest was that he had been an unpaid consultant of Quest until he resigned in July 2004. He also indicated that he would probably provide consulting services to the company, if he were asked to do so.

5.      In August 2006, I traveled to Oklahoma to interview Erma Huckstep. Ms. Huckstep resides in Okmulgee, Oklahoma, in a mobile home that was purchased by Clayton Smart. From that interview, *I learned that Ms. Huckstep is seventy-eight (78) years old, a retired school teacher, and that Smart's wife is her niece. Ms. Huckstep indicated that Smart had appointed her to act as a figurehead president of Quest. Ms. Huckstep stated that she has no knowledge about Quest, nor does she have any knowledge about its operations or financial affairs. Ms. Huckstep also advised me that Smart came to her house and told her that he wanted her to serve as president of Quest, because he was the CEO of Quest, and therefore could not serve as president.* Ms. Huckstep said that Stephen Smith came by her house on several occasions to have her sign documents on behalf of Quest. Ms. Huckstep advised that she did not read the documents that she signed, because she trusted Smart.

6.      In August 2006, I interviewed Stephen Smith who Smart identified as his attorney. Smith stated that he knew Erma Huckstep because he had represented her in her divorce proceedings. Smith stated that Ms. Huckstep was the owner of Quest, and that Ms. Huckstep had purchased Quest for $20,000,000 from Smart's wife, Nancy Smart. I asked Smith how a retired school teacher had managed to raise that amount

6

of money to purchase a $20,000,000 business, and Smith stated that Ms. Huckstep had received money in her divorce settlement. When Smith was questioned about the amount of the settlement, he admitted that Ms. Huckstep had received substantially less than $1,000,000. Smith also stated that he had no knowledge about Ms. Huckstep's financial condition.

7.     In August 2006, I interviewed Christy Michelle Heisey. ***Ms. Heisey admitted that she is Clayton Smart's stepdaughter. Ms. Heisey indicated that she was an officer of Quest in name only, and that Smart had given her the titles of president, and later named her as secretary/treasurer when Erma Huckstep became president.***

\*     \*     \*

9.     In August 2006, I interviewed Reggie Palmer, a Certified Public Accountant whose office is located in Henrietta, Oklahoma. During Smart's March 2006, meeting with employees of the Burial Services Section of the Tennessee Department of Commerce and Insurance, Smart advised that Palmer was his personal tax accountant, Quest's tax accountant, and that Palmer had prepared Quest's tax returns. During the interview with Palmer, he advised that he had been Smart's accountant for the last six to eight years, had prepared Smart's personal tax returns, and had prepared tax returns for various companies that Smart owned, including Quest. ***Palmer stated that Smart is the sole owner of Quest and that Smart had given Ms. Heisey, Smart's stepdaughter, the title of president, and later made Ms. Heisey secretary-treasurer of the company.*** Palmer stated that he had prepared Quest's 2004 tax return at the request of Smart. Palmer stated that Smart signed the return as owner of the company. ***Palmer also stated that in 2004, Quest was insolvent because it had an operating loss, and a negative net worth.***

10.     ***I obtained a copy of Quest's 2004 tax return from Palmer. A copy of that tax return is attached as Exhibit 1. The information in that return confirmed Palmer's statements that Smart was listed as the owner of Quest, and that the financial information in the return indicated that Quest was insolvent.***[5]

King also discovered that Smart made efforts to redeem the $5.6 million in the Topiary Fund in late 2006.[6]

---

[5] *TDCI Ex. 4* at 1 – 4 (emphasis added). King was listed by the TDCI as a witness in the list submitted by the TDCI. Instead of having King testify, his affidavit was received into evidence without objection. Forest Hill offered no evidence with respect to the factual allegations contained in the affidavit. The Court considers the facts contained in the affidavit as uncontested for purposes of the pending motions.

[6] *Id.* at 5.

7

In July 2006, Smart held a press conference in Memphis during which he publicly announced that Forest Hill could no longer afford to honor the approximately 13,500 preneed funeral and burial policies it had sold. The announcement was not well received by those who had purchased preneed services from Forest Hill. At Smart's direction, Forest Hill began charging additional sums to holders of preneed contracts. Although the record is not a model of clarity on this issue, it appears that Forest Hill began charging holders of preneed contracts up to an additional $4,000 per funeral.

In August 2006, the TDCI conducted another audit of the books and records of Forest Hill. After completing the audit, the TDCI issued a 221 page report detailing its findings.[7] The audit report listed no less than 22 deficiencies in the financial management of Forest Hill. Included in these findings were determinations that the investments in Quest and the Topiary Fund violated the Tennessee prudent investment rule, and that Forest Hill had failed to fully fund some of the Trust Accounts as required under Tennessee law. Forest Hill was given 30 days to respond to the report. The issues identified in the report were not addressed to the satisfaction of the TDCI. On December 21, 2006, the TDCI issued an order of conditional suspension of Forest Hill's operations. Also in December 2006, charges were filed against Forest Hill before the Tennessee Funeral Board with respect to its handling of preneed burial funds and the practice of charging holders of preneed contracts an additional $4,000 for burial services.

On January 8, 2007, the Commissioner of the TDCI and William L. Gibbons, District Attorney General of the 30th Judicial District of Tennessee, filed a verified complaint (the "Chancery Action") in the Chancery Court for Shelby County, Tennessee (the "Chancery Court"), seeking a Temporary Restraining Order protecting the assets and records of Forest Hill. The

---

[7] *TDCI Ex. 15.*

8

Chancery Action named Forest Hill, Smart, Smith, Indian Nation, and Redbud Tree Investments, LLC, as defendants. TDCI and Gibbons also sought the appointment of a receiver for Forest Hill. Smart and Smith actively resisted the relief sought in the Chancery Action.[8]

The Chancery Court entered an *ex parte* Temporary Restraining Order ("TRO") on January 8, 2007, and set a hearing on the Motion for Appointment of Receiver and Application for Temporary Injunction for 10:00 a.m. on January 23, 2007. The TRO restrained all defendants from concealing, transferring, or in any way disposing of any corporate or personal assets. The TRO was amended twice (on January 10th and January 18th) by agreement to enable the cemeteries and funeral homes to have limited access to operating funds to pay payroll and limited operating expenses after first obtaining approval of the TDCI, and to allow for liquidation of the Topiary Fund with the proceeds to be reinvested in accordance with the prudent investment rule.

Smart and Smith took additional action after the filing of the Chancery Action. On January 15, 2007, they executed a corporate resolution as the owners of Forest Hill appointing Bill Koehler ("Koehler") as "chief reorganization officer" of Forest Hill.[9] The resolution also authorized the filing of Forest Hill's Chapter 11 bankruptcy case. Under its terms, Smart and Smith agreed to relinquish any and all control over Forest Hill and to take no "action to interfere with Bill Koehler's exclusive dominion and control of the Company [Forest Hill] except as specifically authorized by the Bankruptcy Court."[10] Smart and Smith also agreed to indemnify Koehler against any claims which they might make against Koehler as a result of his management of Forest Hill "except for

---

[8] *See TDCI Ex. 26.*

[9] *TDCI Ex. 11.*

[10] *Id.*

9

actual fraud or intentional tortious conduct."[11]  Neither Smart nor Smith agreed to cooperate with or assist Koehler in the performance of his new duties.

On the afternoon of January 22, 2007, Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in this Court.  On January 26, 2007, the TDCI filed its motion asking this Court to either dismiss this case under § 1112(b) or abstain from hearing it under § 305.  In the alternative, the TDCI asked this Court, in the event it determined that dismissal or abstention was not appropriate, to transfer the case to the Western District of Tennessee. This motion has been joined by Max Shelton, the receiver appointed by the Chancery Court,[12] and Community Trust.[13]

Although all who have appeared before this Court in this case (including Koehler) have either directly or indirectly revealed their distaste for the conduct of Smart and Smith prior to the filing of this case, no such complaints have been lodged with respect to Koehler.  Koehler is a certified public accountant with over 20 years experience in the area of managing and reorganizing troubled businesses.  The parties who seek dismissal of this case have gone out of their way to state to the Court that they have no concerns with Koehler's ability or integrity.  There is nothing in the record to indicate that Koehler is not well qualified for the tasks which he is undertaking in this case, with the possible exception that the record is silent as to whether Koehler has any prior experience in the funeral business.

---

[11]  *Id.*  The concept of indemnifying an individual against claims which could be made against that individual by the indemnitors is a bit lost on this Court.

[12]  *See Docket No. 136*.

[13]  *See Docket No. 175*.

Case 07-80056   Doc 207   Filed 03/26/07   Entered 03/26/07 11:51:03   Desc Main
Document      Page 10 of 27

Koehler had no prepetition involvement with Forest Hill.[14]  Smart and Smith have had no postpetition input into the management of Forest Hill:  all decisions are currently being made by Koehler.  Moreover, Smart and Smith have had absolutely no postpetition involvement with Forest Hill, and have taken no steps to assist Koehler with the performance of his duties.  Smart and Smith have retained their equity interests in the Debtor.  Koehler believes that these interests have no economic value.

Koehler sought and obtained two extensions of time to file the Debtor's schedules and statement of affairs in this case.  At a hearing held on March 1, 2007, with respect to the second request for an extension of time to file schedules, he testified extensively regarding the condition of the Debtor's books and records at the time he assumed his position.  Koehler described the state of those books and records at the time of his appointment as one of "shameful neglect."[15]  Many of the Debtor's books and records were not available to him, having been subpoenaed by the Internal Revenue Service.  Koehler also testified that it did not appear that the Debtor had maintained any records of its income in 2006, or tracked the monies that it had been paid on preneed contracts during that time.  Koehler stated that there were literally "stacks" of funeral contracts found in the Debtor's business offices which had not been recorded in the Debtor's bookkeeping system. During 2006, not one bank reconciliation was performed, and not one dollar of revenue was recorded in Forest Hill's books.  In addition, Forest Hill failed to keep records regarding its payroll expenses

---

[14]  Although Koehler testified that he did have input into the decision to file this Chapter 11 case, the Court discounts that testimony in light of the corporate resolution authorizing the hiring of Koehler.  The resolution indicates that the decision to file the Chapter 11 had been made by Smart and Smith before Koehler was retained.  *See TDCI Ex. 11*.

[15]  Koehler attributed these words to an unnamed auditor or examiner who had also reviewed the books and records of Forest Hill.  As he did so, Koehler indicated his full agreement with the assessment.

in 2006. The only item tracked in any fashion by the Debtor in 2006 was its accounts payable. Koehler also informed the Court that Forest Hill had not closed its books and records for calendar year 2006 when he assumed control of the operation. He further testified that these deficiencies would have to be corrected before accurate bankruptcy schedules could be filed, and before an accurate picture of Forest Hill's financial condition could be painted.

Koehler also testified regarding the Debtor's operations at the March 12, 2007, hearing. Debtor currently has approximately fifty-five employees. Of those employees, forty are located in Tennessee, ten in Arkansas, and five in Oklahoma. The five employees in Oklahoma consist of Koehler, Bill Johnson, who acts as the Debtor's controller, an individual described as being responsible for "human resources," an accounts payable clerk, and a data entry clerk. Koehler, although ostensibly responsible for the management of the company, does not deal with the daily revenue generating aspects of the business. Those duties are handled by Norma Scott, who lives in the Memphis area and is on site at the funeral home locations in Tennessee.

According to Koehler, the Debtor is in dire financial straits. Sales have dropped off precipitously. The funeral homes and the mausoleums are in need of significant maintenance; for example, Koehler testified that when he took control of the operations, one of the areas used for the preparation and embalming of deceased individuals was without air conditioning. Moreover, much of the equipment needed to maintain the cemeteries (such as lawn mowers) is beyond repair and in need of replacement. Koehler testified that he has compiled and prioritized a list of items that require repair or replacement; Forest Hill will address these items as cash becomes available. Koehler did not indicate that Forest Hill has any credit available. Upon examination by the Assistant United States Trustee, Koehler testified that the Debtor was operating at a break-even or

Case 07-80056    Doc 207    Filed 03/26/07    Entered 03/26/07 11:51:03    Desc Main
Document    Page 12 of 27

"push" basis with its current income and expenses, but that many expenses, including professional fees incurred in the reorganization and payment of quarterly fees to the Office of the United States Trustee, were not included in this calculation.

Koehler also stated that it would be necessary to pursue various avenues of litigation in order to account for and hopefully recover all or some of the missing trust funds. Koehler is investigating or intends to investigate prepetition transfers made by the Debtor to Smart and/or Smith, transfers between Forest Hill and other entities owned and/or controlled by Smart, and transfers from the Trust Accounts to entities owned and/or controlled by Smart.[16] All of this potentially places Koehler in a position directly adverse to Smart and Smith, who placed him in control of Forest Hill.

Debtor filed its schedules and statement of affairs in this case on March 16, 2007, four days after the Court heard TDCI's motion.[17] The Court takes judicial notice of the schedules on its own motion, and treats the statements contained therein as admissions by the Debtor. The schedules indicate that Forest Hill owns assets worth $6,858,551.86 and has liabilities of $35,503,697.35. Although Forest Hill has listed the Trust Accounts as an asset, it did not ascribe a value to them. Debtor's real estate is valued at $6,171,238, based upon values used by Forest Hill for insurance purposes.[18] Of the approximately $35 million in liabilities, the Debtor has listed $22,293,262.92 in unsecured claims owed to the 13,500 holders of preneed contracts, and $10,719,400 by virtue of its

---

[16] It appears that similar causes of action are currently pending in the Chancery Action. *See TDCI Ex. 7.*

[17] *Docket No. 194* (filed March 16, 2007).

[18] Debtor admits that the valuations contained in the schedules are not based upon an appraisal, as Debtor does not have the funds available to pay for such an appraisal. Instead, the real estate values in the schedules are the values utilized "for insurance purposes." *Docket No. 194*, Part 1 at 5.

13

guaranty of the trust funds to First Hope Bank, one of the trustees for the Trust Accounts.[19] Debtor also has approximately $370,000 in unpaid priority claims, including claims owed to taxing authorities. The balance of unsecured debt (almost $3 million) appears to be trade debt, almost all of which was incurred after Smart and Smith acquired Forest Hill.

In the statement of affairs, the Debtor notes that its income in 2007 has fallen drastically.[20] The Debtor also indicated that its prior management had failed to close or reconcile any of its books since December 31, 2005, which made obtaining accurate financial information quite difficult. The statement of affairs also reveals that, at the time the case was filed, Debtor was involved in no less than eight separate items of litigation, including the Chancery Action.

Koehler's plan for Forest Hill is to sell the company (or its assets) as a single going concern as quickly as possible. The reasoning behind this strategy is that, given the inability of prior management of Forest Hill to honor obligations under the preneed contracts, the goodwill of Forest Hill is non-existent. According to Koehler, the only way to rebuild the credibility of this business is with new ownership: current ownership simply cannot repair the damage that has been done. Koehler readily acknowledged that any potential buyer of Forest Hill must obtain from the State of Tennessee a license to operate the funeral homes, cemeteries, and mausoleums. Put another way, no one can purchase Forest Hill without the approval of the State of Tennessee. While Koehler indicated that he has talked to more than one entity about the possibility of purchasing Forest Hill,

---

[19] *Id.* at 37.

[20] Debtor stated that gross income from January 1, 2007 to January 22, 2007, was $166,190, which on a pro-rated basis would be equivalent to $226,623 per month. Gross income for calendar year 2005, the most recent year that Debtor has closed its books and records, was $4,208,595, or $350,716 per month. Debtor estimated its 2006 gross income at $3,775,000, or $314,583 per month.

there are no offers to purchase the Debtor currently pending, nor is there any evidence that an offer is expected in the near future.

Koehler acknowledges that the fate of the preneed contracts is a key facet of any sale of Forest Hill. Koehler expressed his hope that a buyer of Forest Hill would honor all existing preneed contracts as part of a sale. To date, one potential buyer has indicated to Koehler an interest in honoring those contracts, while another has stated that it would not be interested in honoring those contracts as part of any sale. There is no solid evidence in the record as to the cost of performance of those contracts.[21]

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," such items are incorporated herein by this reference.

## Burden of Proof

The questions before the Court are whether this Court should dismiss this case on the basis that it was filed in bad faith, abstain from hearing this case under § 305, or transfer venue of the case to the United States Bankruptcy Court for the Western District of Tennessee. With respect to the issue of dismissal, "[t]he burden to show cause for dismissal of a Chapter 11 bankruptcy rests on the movant by a preponderance of the evidence. Once a movant has made a *prima facie* showing of bad faith, the burden falls to the debtor to establish that the bankruptcy was filed in good faith."[22] On

---

[21] There was some testimony to the effect that, based upon the alleged additional charges of $4,000 per funeral service/burial which Forest Hill, at the direction of Smart, was charging existing preneed customers, the cost of performing the 13,500 preneed contracts would be in the range of $54,000,000. The Court finds an insufficient foundation for the $4,000 figure in the record and thus gives it little or no weight. The evidence before the Court does not allow a reasonable fact finder to reach any meaningful conclusion regarding the cost of performance of the preneed contracts. The testimony of the witnesses in this regard was little more than guesswork.

[22] *In re Muskogee Envtl. Conservation Co.*, 236 B.R. 57, 59 (Bankr. N.D. Okla. 1999).

15

the issue of discretionary abstention under § 305, the burden of proof lies with the party seeking abstention.[23]   Similarly, a party seeking a change of venue bears the burden to establish by a preponderance of the evidence that such a change is warranted.[24]

## Conclusions of Law

TDCI asks the Court to dismiss this case for one of two reasons – either because the case was filed in bad faith or because it is appropriate for the Court to allow the Chancery Court to go forward.   Failing dismissal, TDCI asks this Court to transfer venue of the case to the Western District of Tennessee, which is where the funeral homes, mausoleums, three of the seven cemeteries, and the day-to-day business operations of Forest Hill can be found.   The Court will consider each of these issues in turn.

*Dismissal Based Upon Bad Faith*

Section §1112(b)(1) provides that "on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause."[25]   The majority of courts, including this one, have held that cause exists under this section when a

---

[23]   *In re Taylor Agency, Inc.*, 281 B.R. 354, 359 (Bankr. S.D. Ala. 2001).

[24]   *In re Vienna Park Props.*, 125 B.R. 84, 87 (S.D.N.Y. 1991);  *Nat'l Coop. Refinery Ass'n v. Rouse*, 60 B.R. 857, 863 (D. Colo. 1986).

[25]   § 1112(b)(1).

bankruptcy case was filed in bad faith.[26]  Good faith is an "amorphous notion" and must be

determined on a case-by-case basis based on specific factual inquiry.[27]  As was eloquently stated by

Judge Romero of the United States Bankruptcy Court for the District of Colorado:

> Determining whether a debtor's filing for bankruptcy protection is in good faith
> requires the bankruptcy court's on-the-spot evaluation of the debtor's financial
> condition, motives, and the local financial realities.  Findings of bad faith in
> proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring
> but non-exclusive patterns, and are based on a conglomerate of factors rather than
> on any single event. . . . Individual factors, in and of themselves, may not lead to a
> conclusion that a bankruptcy filing is in bad faith.  Bad faith is found when the
> cumulative effect of these individual factors together paint a factual picture that leads
> to the inescapable conclusion that use of the bankruptcy laws by the debtor is
> inappropriate.[28]

While no single factor is determinative, courts have enumerated some non-exclusive factors for

evaluating good faith in the filing of a bankruptcy case:

> (1) the debtor has one asset;

> (2) the prepetition conduct of the debtor has been improper;

> (3) there are only a few unsecured creditors;

> (4) the debtor's property has been posted for foreclosure, and the debtor has been
> unsuccessful in defending against the foreclosure in state court;

> (5) the debtor and one creditor have proceeded to a standstill in state court litigation,
> and the debtor has lost or has been required to post a bond which it cannot afford;

---

[26]  *See, e.g., In re Nichols*, 223 B.R. 353, 359 (Bankr. N.D. Okla. 1998); *In re Trident
Assocs. Ltd. P'ship*, 52 F.3d 127, 130 (6th Cir. 1995) (remarking that eight circuits have held the
same)*; In re Laguna Assocs. Ltd. P'ship*, 30 F.3d 734 (6th Cir. 1994) (hereafter "*Laguna*"); *In re
Charfoos*, 979 F.2d 390 (6th Cir. 1992); *In re Caldwell* (*Hardin v. Caldwell*), 851 F.2d 852 (6th
Cir. 1988); *In re Adell*, 310 B.R. 460, 465–66 (Bankr. M.D. Fla. 2004) ("Courts now uniformly
agree that 'bad faith' justifies a dismissal of the Chapter 11 case for 'cause.'").

[27]  *See In re Okoreeh-Baah*, 836 F.2d 1030, 1033 (6th Cir. 1988); *Laguna*, 30 F.3d at 737.

[28]  *In re Gunnison Ctr. Apartments, LP*, 320 B.R. 391, 399–400 (Bankr. D. Colo. 2005)
(footnote and citations omitted).

(6) the filing of the petition effectively allows the debtor to evade court orders;

(7) the debtor has no ongoing business or employees;  and

(8) the lack of possibility of reorganization.[29]

Another factor often identified by bankruptcy courts as an indication of bad faith is the "new debtor syndrome," where property is transferred to a new entity and the new entity is placed into a Chapter 11 case for the purpose of defeating creditors' remedies under state law.[30]  While the use of factors or lists in this type of situation is helpful and appears to simplify the issues, one must be wary not to become too reliant on such lists.  Rarely do the facts of one case easily dovetail into factors created based upon the facts of a prior case.  Ultimately, "[t]he determination of whether a bankruptcy case has been filed in good faith is a matter left to the sound discretion of the bankruptcy court."[31]

Current management and counsel for the Debtor have gone to great lengths to distance themselves from the conduct of Smart (and perhaps, to a lesser degree, Smith).  Smart and Smith no longer have any say in the operations of the Debtor.  Koehler does not answer to them in any way, shape, or form.  As a result, Debtor argues that the Court should not consider the motives or conduct of Smart and Smith in making its determination as to whether this case was filed in good faith.  In effect, Debtor's current management and its counsel are saying to the Court, "We are here now.  We

---

[29] *Laguna,* 30 F.3d at 738 (citations omitted)(emphasis added).  The *Laguna* analysis was adopted by the Tenth Circuit in *In re Nursery Land Dev., Inc.*, 91 F.3d 1414, 1416 (10th Cir. 1996).  *See also In re Nichols,* 223 B.R. at 359.

[30] *See, e.g., Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.),* 779 F.2d 1068, 1073 (5th Cir. 1986); *Natural Land Corp. v. Baker Farms, Inc. (In re Natural Land Corp.),* 825 F.2d 296, 298 (11th Cir. 1987); *In re Duvar Apt., Inc.,* 205 B.R. 196, 200 (9th Cir. BAP 1996).

[31] *In re Nichols,* 223 B.R. at 359.

Case 07-80056    Doc 207    Filed 03/26/07    Entered 03/26/07 11:51:03    Desc Main
Document      Page 18 of 27

have done nothing wrong and are here to correct the sins of those who have gone before us. Why they filed the case is irrelevant. What they did before the case was filed is irrelevant. The only thing that should be considered is our intentions for the future of this Debtor." The Court respectfully disagrees. As the United States Court of Appeals for the Fifth Circuit has noted, "[e]very bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for *commencement*, prosecution, and confirmation of bankruptcy proceedings."[32] It seems the most elementary of propositions that the motivation of those who cause a debtor to seek bankruptcy relief is relevant to a determination of whether a case was filed in good faith.

It was Smart and Smith, <u>not</u> Koehler, who made the decision to file this case. Koehler was given no authority over the affairs of the Debtor until after the decision was made to file the case. The Court concludes that the factors which led to the filing of this case, as well as the purpose and intent of Smart and Smith in filing the case are relevant and should be considered in determining whether this case was filed in good faith. To decide otherwise would grant management of any debtor, regardless of its subjective intent, the ability to prevent a bankruptcy court from reviewing its conduct simply by replacing management at the outset of the case. In effect, the Court would be creating a corollary to the "new debtor syndrome," the "new management syndrome," wherein all conduct of those who caused a Chapter 11 case to be filed would be insulated from judicial review upon the installation of new management.

The prepetition conduct of Smart and Smith, in their capacity as acting management of

---

[32] *In re Little Creek Dev. Co.,* 779 F.2d at 1071 (citations omitted) (emphasis added). *See also In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1395 (11th Cir. 1988) ("The possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith."); *In re Natural Land Corp.*, 825 F.2d at 298 ("It seems unquestionable to us that the taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal[.]").

19

Forest Hill, is rife with indicia of bad faith. Forest Hill ran up unsecured trade debt in the amount of approximately $3 million in the roughly two-year period after the business was acquired by Smart and Smith. Smart took millions of dollars from the Trust Accounts and invested them in high-risk ventures in which he was involved and/or had control over, even after being informed by representatives of TDCI that such investments were improper under Tennessee law. Smart actively misrepresented to the TDCI his past and present control over Quest and caused millions of dollars to be placed in that company. The current whereabouts of those funds is largely unknown.[33] After the transfers of funds to Quest and the Topiary Fund, Smart told the 13,500 people who had prepaid for their funerals that he was not able to honor their contracts.

The financial records of Forest Hill were substandard at best, and at worst were in shambles. Its books and records have not been reconciled since December 2005. Forest Hill did not even *attempt* to keep track of its income, including payments received on preneed contracts (which would constitute trust funds), during 2006. When the TDCI completed its investigation and the action in the Chancery Court was reaching the point where Smart could lose control of Forest Hill to a receiver, the bankruptcy case was filed. Since this case was filed, Smart and Smith have done nothing to correct the deficiencies that they helped create. Based upon these facts, the Court concludes that Smart and Smith did not file this case in good faith with any intent toward seeing

---

[33]  Indeed, there is nothing in the record to establish that the money placed into Quest was actually put into any investment, no matter how speculative. In an affidavit received into evidence in this matter without objection, King testified that, based upon his review of the bank account records of Quest, he "found nothing to indicate that Quest is actually involved in the business of drilling for oil and gas. [He] found nothing to indicate that payments were being made to seriously explore, develop, or produce any oil or gas." Moreover, "[b]ased on [his] review of the records, it appears that Smart and Smith used the [Quest] account primarily to move money from one or more accounts to accounts at other banks, and brokerage houses." *TDCI Ex. 5* at 8.

Case 07-80056    Doc 207    Filed 03/26/07    Entered 03/26/07 11:51:03    Desc Main
Document      Page 20 of 27

Forest Hill reorganize. To the contrary, the Court finds that Smart and Smith filed this case in order to evade the regulatory authority of the State of Tennessee, and avoid having a receiver obtain control of Forest Hill in the Chancery Action.

The Court also finds that several of the factors identified by the *Laguna* court and utilized by this Court in the *Nichols* case are present here. As noted above, the prepetition conduct of the Debtor (through Smart) was improper. Millions of dollars are gone without reasonable explanation. Although the Chancery Action is not a foreclosure action (the action in *Laguna*), it is analogous to a foreclosure action: if the TDCI prevailed, Smart would lose all control over Forest Hill, and the assets of Forest Hill would be wrested from his control. The filing of the bankruptcy petition allowed Forest Hill (and Smart) to escape the receivership hearing in the Chancery Court. These factors, especially when coupled with the prepetition management practices of Smart and Smith identified above, lead this Court to conclude that this bankruptcy case was filed in bad faith.

The determination that this case was filed in bad faith does not end the Court's work. Section 1112(b)(1)

> invokes a two-step analysis, first to determine whether "cause" exists either to dismiss or to convert the Chapter 11 proceeding to a Chapter 7 proceeding, and second to determine which option is in "the best interest of creditors and the estate." *See In re Mechanical Maintenance, Inc.*, 128 B.R. 382, 386 (E.D. Pa. 1991). Once "cause" is established, a court is required to consider this second question of whether to dismiss or convert. *In re Finney*, 992 F.2d 43, 45 (4th Cir. 1993).[34]

The TDCI has not asked this Court to consider whether conversion is appropriate: it only seeks dismissal of the case. Even so, the Court must consider whether conversion is preferable to dismissal. Upon review, the Court answers the question in the negative.

---

[34] *Rollex Corp. v. Associated Materials, Inc. (In re Superior Siding & Window, Inc.)*, 14 F.3d 240, 242 (4th Cir. 1994), cited with approval in *In re BTS, Inc.*, 247 B.R. 301, 308 (Bankr. N.D. Okla. 2000).

The governmental entities which regulate funerals and those who would provide them have a significant interest in seeing to it that those regulations are followed. In this case, the TDCI and the Tennessee Attorney General have a strong, perhaps even compelling, interest in seeing the Chancery Action run its course and that the conduct of Debtor and its prepetition management is properly brought to the light of day. The TDCI and the Tennessee courts are in the best position to do so. Converting this case to a case under Chapter 7 would not further those goals.

There is another compelling reason not to convert this case. All of the parties have agreed that the best way to proceed with respect to this Debtor is to attempt to sell its business as a going concern. The parties also agree that any buyer must be approved by the TDCI. It thus appears to the Court that sale of the Debtor is either a one-step process (through the Chancery Action) or a two-step process (first through the bankruptcy court, then to the TDCI), with the TDCI having what amounts to a veto power over any potential sale brokered in the bankruptcy case. Therefore, the best manner of sale of the business is with the blessing of the TDCI in the Chancery Action. Dismissal, not conversion, best serves this purpose.

Under § 1112(b)(1), the Court is required to convert or dismiss a Chapter 11 case upon a showing of cause "absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interest of creditors and the estate."[35] The Court finds no such "unusual circumstances" present in this case. To the extent Forest Hill argues that the removal of Smart and Smith and their replacement by Koehler constitute "unusual circumstances" which should cause the Court to ignore the actions of Smart and Smith, the Court expressly rejects such a notion for the reasons set forth above. The Court finds that dismissal of this

---

[35] § 1112(b)(1).

22

case is in the best interests of creditors and the estate.

Section 1112(b)(2) provides that a bankruptcy court should not grant a motion to dismiss, absent unusual circumstances, if the debtor objects and establishes a reasonable likelihood that a plan will be confirmed within a reasonable period of time and, if the case is being dismissed due to an act or omission of the debtor "for which there exists a reasonable justification for the act or omission," the act or omission "will be cured within a reasonable period of time fixed by the court."[36] In the present case, Debtor has failed to meet either of these conditions. All parties agree that a sale of Forest Hill is the only way to reorganize this debtor. Although Koehler is looking for a buyer for Forest Hill, there is nothing to indicate that a sale is in prospect. Given the Debtor's precarious cash flow, the massive decline in the value of the Trust Accounts, the negative publicity generated as a result of Smart's conduct and the Debtor's failure to honor preneed contracts, and the general state of disarray of Debtor's books and records, a sale of Forest Hill to a bona fide purchaser in the near future appears enormously problematic. Moreover, the conduct of Smart and Smith which is at the foundation of the Court's decision is subject to neither reasonable justification nor timely cure. Debtor spent much time before this Court trying to distance itself from the conduct of Smart and Smith, and has made no effort to provide any justification, reasonable or unreasonable, for the conduct. There is nothing in this case to suggest that, under the provisions of § 1112(b)(2), this case should not be dismissed.

*Abstention*

In the alternative, the TDCI also asks this Court to abstain from hearing this matter under § 305(a)(1), which states that a bankruptcy court "may dismiss a case under this title, or may

---

[36] § 1112(b)(2).

Case 07-80056    Doc 207    Filed 03/26/07    Entered 03/26/07 11:51:03    Desc Main
                            Document          Page 23 of 27

suspend all proceedings in a case under this title, at any time if the interests of creditors and the debtor would be better served by such dismissal or suspension."[37]  Factors to be considered include:

> (1) the motivation of the parties in seeking bankruptcy jurisdiction;
>
> (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;
>
> (3) the economy and efficiency of administration; and
>
> (4) the prejudice to the parties.[38]

"Abstention and dismissal under § 305(a)(1) is applied very narrowly and is only proper in extraordinary circumstances."[39]  The decision whether to abstain from hearing a particular case is left to the sound discretion of the bankruptcy court.[40]

The motivation of Smart and Smith in seeking bankruptcy jurisdiction has been previously discussed, and favors abstention.  The Chancery Court stands ready to address the sale of the Debtor or its assets in such a manner as to preserve (if at all possible) the going concern value of the Debtor. With respect to the other aspect of this case – namely, the tracing and possible recovery of trust funds – those actions will necessarily involve application of the laws of the State of Tennessee which govern the funeral business.  The Chancery Court (as well as any receiver which has been or may be appointed) is in a far better position to analyze and apply Tennessee law than is this Court. The Court finds the interests of the State of Tennessee in regulating funeral homes which conduct

---

[37] § 305(a)(1).

[38] *In re ELRS Loss Mitigation, LLC*, 325 B.R. 604, 634 (Bankr. N.D. Okla. 2005) (*citing In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001) (citations omitted)).

[39] *In re Taylor Agency, Inc.*, 281 B.R. 354, 359 (Bankr. S.D. Ala. 2001) (citation omitted).

[40] *In re ELRS Loss Mitigation,* 325 B.R. at 634 (and cases cited therein).

24

business in its state to be a highly persuasive factor in support of abstention.

One of the main arguments advanced by the Debtor regarding efficiency or prejudice if the Court abstains from hearing this case is the loss of the knowledge of Debtor's operations acquired by Koehler. The Court finds such allegations of prejudice unsubstantiated by the record. Koehler has no institutional knowledge of the Debtor: he has been employed there approximately two months. Although Koehler has extensive experience in working with troubled businesses, he has no documented experience in the funeral business, and certainly no experience when it comes to running a funeral business regulated by the State of Tennessee. Much of his efforts to date have been focused on the preparation of the financial information contained in the schedules, statement of affairs, and monthly operating report that were only recently filed. That information is readily available and will not be lost upon dismissal of this case. Moreover, it is not inconceivable that, to the extent Koehler has garnered knowledge that is of use to any receiver appointed in the Chancery Action, Koehler can assist such a receiver.

Debtor also argues that a bankruptcy case is preferable to a state court receivership because a receiver appointed in Tennessee will have no jurisdiction over the Debtor's cemeteries located in Arkansas and because a Tennessee receiver will favor Tennessee creditors over creditors located in other states. The Court is not persuaded. The majority of the assets of Forest Hill are located in Tennessee: there can be no doubt as to the jurisdiction of a Tennessee receiver over that property. As to the cemeteries located in Arkansas, there is little doubt that a Tennessee receiver could obtain jurisdiction over those properties, either under principles of comity or through the creation of an ancillary receivership.[41] Debtor's argument that a Tennessee receiver will prefer Tennessee creditors

---

[41] *See, e.g., Choctaw Coal & Mining Co. v. Williams-Echols Dry Goods Co.,* 87 S.W. 632 (Ark. 1905); *Hardee v. Wilson,* 167 S.W. 475, 477 (Tenn. 1914).

Case 07-80056    Doc 207    Filed 03/26/07    Entered 03/26/07 11:51:03    Desc Main
Document    Page 25 of 27

to other creditors is little more than speculation. None of the creditors that Debtor ostensibly seeks to protect have come forward to object to dismissal or abstention.[42]

The Court finds that the Chancery Court is better suited to deal with the issues faced by Forest Hill. The best way for the Chancery Action to go forward is for this Court to voluntarily step aside. Accordingly, even if cause to dismiss this case were not present under § 1112(b)(1), the Court would abstain from hearing this case under § 305(a)(1).

*Venue*

Finally, TDCI asks that if the case is not dismissed, it be transferred to the Western District of Tennessee on the grounds that Tennessee is a more convenient venue. TDCI did not take the position that venue was improper in the Eastern District of Oklahoma. Having determined that cause exists to both dismiss this case under § 1112(b)(1) and abstain from hearing this case under § 305(a)(1), the Court need not reach the issue of venue.[43]

### Conclusion

Cause exists for dismissal of this case under § 1112(b). Even if such cause did not exist, there are ample grounds for this Court to exercise its discretion and abstain from hearing this case under § 305(a)(1). As a result, this case is hereby dismissed. A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

---

[42] Notice of this hearing was given to all creditors and parties in interest listed on the list of creditors and matrix filed by the Debtor at the inception of the case. *See Docket No. 73.*

[43] In its pretrial brief and in oral argument on March 12, 2007, counsel for Community Trust argued that venue was improper in this district, and that transfer to the Western District of Tennessee was mandatory. Community Trust did not file its own motion for change of venue: it merely joined in the motion brought by the TDCI. In its motion, the TDCI affirmatively alleged that venue of this case was proper in the Eastern District of Oklahoma.

Case 07-80056    Doc 207    Filed 03/26/07    Entered 03/26/07 11:51:03    Desc Main
Document    Page 26 of 27

Dated this 26th day of March, 2007.

BY THE COURT:

TERRENCE L. MICHAEL
UNITED STATES BANKRUPTCY JUDGE

4835.8

27